IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CINDY HARRIS, F. RICHARD          )
HEATH, JAY MANKITA and            )
KATHY MOSER,                      )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )     Civil Action No. 06-169
                                  )
TOWNSHIP OF O'HARA,               )     Magistrate Judge Lisa Pupo Lenihan
ALLEGHENY COUNTY,                 )
PENNSYLVANIA, et al.              )
                                  )
          Defendants.             )

**MEMORANDUM OPINION**

I.  **SUMMATION**

Plaintiffs Cindy Harris and F. Richard Heath (the "Homeowners"), and Jay Mankita and

Kathy Moser (the "Performers") brought this action alleging various federal constitutional

violations on the part of the Defendants in connection with the conduct of "house concerts" at the

Homeowner's residence.  More particularly, the Amended Complaint alleges that the

Defendants' zoning-ordinance-related conduct is violative of Plaintiffs' rights under the First,

Fifth and Fourteenth Amendments to the United States Constitution.[1]  The case is currently before the Court on Defendants' Motion to Dismiss.

Because the Court concludes that Plaintiffs' constitutional claims are (1) barred by the statute of limitations as to claims alleged to arise from particular acts of the Defendants in 2003; (2) not yet ripe as to claims alleged to arise from the Zoning Officer's January 26, 2006 Letter and/or subsequent conference with Plaintiffs' counsel; and (3) as to a challenge to the facial constitutionality of the underlying statute, unsustainable on the merits; Defendants' Motion to Dismiss will be granted.

The Court notes in so holding that if the Township's Zoning Hearing Board, in reaching a final determination, were to issue a blanket prohibition on the conduct of music concerts in a private home in a residential zone, without regard to, *e.g.*, the existence or non-existence of commercial indicators, such prohibition would raise significant federal constitutional concerns. But, Plaintiffs' sweeping characterization in their Introduction to the Amended Complaint notwithstanding, that case is simply not presently before this Court.[2]

---

1.  Plaintiffs bring this action under 42 U.S.C. § 1983, which permits recovery in a civil action upon proof that the defendant "under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects . . . any citizen . . . within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws."

2.  The Introduction to the Amended Complaint alleges that the following "events actually took place": that the Township enacted and enforced a local ordinance that, among other things, (1) limited the number of times each year homeowners could entertain invited guests; (2) limited the number of guests allowed at any one time; (3) prohibited playing/listening to acoustic instruments; and (4) prohibited pot-luck dinners.  These aspects of Plaintiffs' purposefully Orwellian characterization are inflammatory, unsupported by Plaintiffs' own factual allegations, and do not serve to facilitate a just resolution of the parties' dispute.  Compare Plaintiffs' Brief in Support of Response to Motion to Dismiss ("Plaintiffs' BSRM") at 26 (noting that residents and officials should "reasonably and flexibly work[] toward solutions").

## II. **FACTUAL HISTORY**

Plaintiff Homeowners have been residents of O'Hara Township, Pennsylvania (the "Township") since 1991.  Plaintiff Performers are musicians who were guests at the residence and who performed music at a "house concert" there on February 2, 2006.  Defendants are the Township; the Township's Zoning Hearing Board (the "Board"); the Township's Council; Cindy L. Davis, individually and in her capacity as the Township's Zoning Officer (the "Zoning Officer"); and Douglas C. Arndt, individually and in his capacity as Township Manager.

Since approximately 1998, Homeowners have been holding "musical gatherings" or "house concerts" (the "concerts") at their O'Hara Township residence, which is in an R-2 (residential) zoning district.  The concerts provide a forum in which out-of-town musicians (*e.g.*, those traveling from one commercial engagement to another) may perform to an in-home audience, perhaps "jam" with other musicians present, share a meal (*e.g.*, a "pot-luck dinner"), have a place to stay for the night, and supplement their income with "donations" collected from individuals attending the concert.  The concerts also provide the hosts and other individuals attending an occasion for social gathering/communion and an opportunity to experience/enjoy the talents of musicians who might not otherwise be accessible to them.[3]  In essence, much like many residential parties, they broaden and sustain an informal community of individuals with shared interests.

---

3.  Plaintiff Cindy Harris is an instrumental musician and vocalist who has occasion to meet and invite acoustic musicians.  The invited itinerant musicians generally perform folk and/or traditional music.

The concerts were first brought to the Township's attention in approximately February, 2003, when neighbors complained about the number of cars parked in the residential neighborhood, which were asserted to be obstructing traffic (*e.g.*, the ability of two cars to pass on the street), and about the concert frequency.  In addition, one neighbor, Kim Watterson - after engaging in internet research regarding the Homeowners' concerts and practices related to the conduct of house concerts generally - raised legal concerns regarding the possibly commercial nature of the concerts, in violation of the residential zoning restrictions.

On February 18, 2003, the Zoning Officer issued an Enforcement Notice of Zoning Violation (the "2003 Notice"), informing the Homeowners that they were in violation of the Zoning Ordinance and requiring that they discontinue the concerts.  The Notice asserted that the concerts were in violation of the residential zoning because they (1) were advertised/promoted in the newspaper and on websites; (2) were open to the general public; and (3) included requested donations for the performers.

Plaintiff Harris appealed the 2003 Notice to the Board and a hearing was held on April 14, 2003 (the "Hearing").  At that time, the Board heard testimony of complaint from the Homeowners' neighbors.  The transcript of the Hearing reflects an exploration of the specific nature of the house concerts occurring at the Homeowners' residence; the specific aspects of those concerts which caused the neighbors to complain; possible avenues for a mutually acceptable resolution of the neighborhood tensions; the basis for distinction between the house concerts as conducted and other private parties; and the specific aspects of the concerts that the Board deemed problematic in a residentially-zoned area because, taken together, they too closely resembled commercial activity.  The tenor of the Hearing reflects the parties' laudable efforts, at

that time, to cooperatively reach accord and the Board's desire to narrowly identify its reasons for affirming the Enforcement Notice before it.[4]

More specifically, the Board identified five features of the house concerts which it deemed *cumulatively* indicative of a commercial nature: (1) that the house concerts were occurring frequently - *e.g.*, eight or more per year, typically one per month from September through April; (2) that the number of guests parking on the street - *e.g.*, in excess of fifty guests - was creating parking problems for residents and/or obstructing through-traffic, as recorded by a police report at the time of one concert;[5] (3) that the Homeowners were requesting a "donation" in the specific amount of $10 at the door; (4) that the Pittsburgh Post Gazette, in its weekend entertainment section, recommended a January, 2003 house concert to its readers and provided Plaintiff Harris' telephone number; and (5) that Plaintiff Harris maintained a website where information on upcoming house concerts and visiting musicians was indiscriminately available to internet viewers.

The Board therefore concluded that it must affirm the Enforcement Notice on the basis of its assessment that the "particular concerts as a whole, and conducted in the manner in which they have been handled heretofore" were "commercial in nature" and therefore "a detriment to

---

4. See Plaintiffs' Brief in Support of Response to Motion ("Plaintiffs' BSRM") at 2 ("A good deal of discussion at the . . . hearing concerned what Plaintiff-homeowners could do to change the manner in which the house concert parties had been handled previously, in order to comply with the Zoning Ordinance.").

5. Plaintiffs' Amended Complaint alleges that the Board's suggestion that the presence of a guest's trailer in front of the Homeowners' house was also problematic was improper as "there is no law or zoning regulation prohibiting" it.  The Court notes that § 72-13.86 of the Township's Zoning Ordinance expressly prohibits the parking of a motor, mobile or recreational trailer on a residential street (it is permitted in, *e.g.*, the rear of the residential property).

the health, safety and welfare of the community." It also, however, expressed its desire to

express what might "be acceptable the next time around" and its willingness to reconsider the

permissibility of house concerts conducted with modifications. See, e.g., Defendants' Reply to

Plaintiff's Brief in Opposition at 4 (citing hearing transcript, in which the Homeowners were

advised that if they were "going to change some of these criteria [that the Board found

cumulatively indicative of commercial activity], the [Board] might be willing to look at it

differently").[6] The Board issued its Findings of Fact and Conclusions of Law in mid-May, 2003

(the "Board's Decision").

Following the Hearing, the Homeowners made no appeal of the Board's Decision to State

or Federal Court, instead electing to modify the manner in which they conducted the house

concerts in an attempt to comply with the Board's specific ruling. The Homeowners reduced the

frequency of the concerts to three (3) in 2004 and three (3) in 2005. They advised their guests to

be mindful of neighbor's driveways when parking and to allow room for through-traffic. No

---

6. Cf. Plaintiffs' BSRM at 16, noting that

> The hearing transcript shows that the [Zoning Hearing Board]
> members believed that they had to either affirm or reject the [2003
> Notice], but the transcript also show that if Plaintiffs made changes
> to the manner in which they hosted their parties, house concert
> parties would not constitute commercial activity . . . . The
> members of the Board were unwilling to give an exact formula for
> changing the house concert parties, but they did state that
> Plaintiffs-homeowners could work out the details with their
> neighbors. Ms. Harris agreed to these general recommendations,
> and the hearing ended.

See also id. at 25 ("The hearing transcript shows that the [Board] members believed that they
were required to either affirm or reject the [2003 Notice], but they also believed they could put
conditions on their affirmance or rejection . . . .").

further publicity of the concerts occurred in the print or other traditional media; and Plaintiff Harris replaced the website information on the house concerts with a notice advising internet readers of the Board's decision and directing them to contact her if they were "interested in house concerts in the Pittsburgh area".[7]  The Homeowners continued to request entirely voluntary "donations", but never took any portion of the monies collected or made any profit from the concerts; to the contrary, the Homeowners sometimes contributed additional monies for the musicians out-of-pocket when they felt voluntary contributions were insufficient.[8]  No parking or street congestion complaints, or complaints of any other nature regarding the house concerts, were brought to the zoning authority's attention for an approximately two year and eight month period.[9]

On January 26, 2006, Plaintiff Harris received correspondence from the Zoning Officer advising that her continuation of house concerts had been brought to the zoning authority's attention once more and indicating that the Homeowners would be in violation of the 2003 Notice if "any [advertised or other] concerts occur" (the "2006 Letter").  The correspondence further advised that if a concert proceeded the Township would "institute a proceeding in front of the District Magistrate and [seek fines of] $500 for each violation."  It would appear that this correspondence from the Zoning Officer was the result of renewed complaint from the

─────────────────────────

7.  Individuals contacting Plaintiff Harris were directly questioned about their interest and, if accepted by her, were added to an e-mail list to receive information about future concerts.

8.  The Homeowners also provided beverages, snacks, and contributed to the pot-luck dinners.

9.  The Amended Complaint characterizes the Board's Decision as requiring the Homeowners to "limit the number of their gatherings, . . . limit the number of their guests . . . ., refuse to talk to newspaper reporters . . . [and] refrain from asking their guests to chip in for food, drink or entertainment."  See Amended Complaint at 37.  See supra n. 2.

Homeowners' neighbor, Ms. Watterson, who had discovered internet information indicating that the Homeowners were planning to hold four more house concerts in a two month period between February 2 and April 5, 2006.[10]  As noted above, the correspondence asserts a blanket prohibition of *any* house concerts at the Homeowners' residence.

Five days later, the Homeowners' counsel met with the Zoning Officer and the Township Solicitor, Phillip Weis, to discuss the 2006 Letter, inform the Township of the manner in which the concerts had been significantly changed, and inform it that the concert scheduled for February 2, 2006 would proceed as planned, as it was not in violation of the Board's Decision.  At that time, the Homeowner's counsel also indicated that no requests for donations would be made and prospective guests had been so informed by prior e-mail.  The concert proceeded with the Performers and twelve guests in attendance, but because neither the Zoning Officer nor the Township Solicitor "would acknowledge that the scheduled concert" could lawfully proceed, the concert was held in fear of dispersal by the police.[11]  Although Defendants took no further prohibitive action against the Defendants on February 2, 2006 or subsequent thereto, the Homeowners allege "a great deal of fear, emotional distress, insomnia and headaches." Amended Complaint at ¶ 44.

---

10.  See Defendants' Brief in Support of Motion to Dismiss ("Defendants' BSMD") at 3-4 (stating that the website "PbgHouseConcerts" provided notice of the four scheduled concerts).

11.  See Amended Complaint at ¶¶ 41-43.  The Court notes that police disruption of the concert was *not* threatened in the Zoning Officer's 2006 Letter.  To the contrary, the letter expressly states that the Township's response, should a concert proceed, would be to institute legal proceedings thereafter and seek to impose a monetary fine upon the Homeowners.

## III.  <u>RELEVANT PROCEDURAL HISTORY</u>

Plaintiffs instituted this action in Federal Court, and the Amended Complaint filed on February 11, 2006 asserts the following claims:

Count I - That certain provisions of the Township's Zoning Ordinance are "facially invalid under the overbreadth doctrine" because they list - in Article V, §§ 72-5.22, 5.23 -six principal uses, ten accessory uses, and six conditional uses of property in an R-2 residential zone and provide - in § 72-1.6 - that "[l]and uses not specifically provided for in Article IV through Article X are hereby prohibited."  More specifically, Plaintiffs assert the provisions are invalid because they "infringe upon a substantial amount of constitutionally protected activity and uses" and "place unbridled discretion in the hands of Defendants to determine if a residential use is lawful."  Amended Complaint at ¶¶ 54, 55.

Count II - That the same provisions of the Zoning Ordinance are unconstitutionally vague because (1) they contain no definition of "commercial activity" as the term was used in the Board's decision; (2) "potentially thousands of uses" - implicating residents' First and Fourteenth Amendment rights to freedom of speech, association and privacy - are prohibited; and (3) the provisions contain no criteria for court review.  <u>Id.</u> at ¶¶ 56-64.

Count III - That the same provisions of the Zoning Ordinance comprise an unconstitutional prior restraint on rights of free speech, association and privacy, as does "the Defendants' Order" to cease and desist musical gatherings.  <u>Id.</u> at ¶¶66-69.[12]

---

12.  Although "the Defendants' Order" is an undefined term, the remainder of this Count suggests that it is intended to encompass the 2003 Notice, the 2003 Findings of Fact and Conclusions of Law, and the 2006 Letter.

9

Count IV - That the "Defendants' unlawful actions" unduly burden Plaintiffs' right to association, in violation of the First and Fourteenth Amendments, because they specifically prohibit house concerts, are not narrowly tailored, and cannot survive a state interest versus individual burden balancing test. Id. at ¶¶ 74-76.[13]

Count V - That the same unlawful actions unduly burden Plaintiffs' right to freedom of speech by prohibiting musical communication, violate Plaintiff Harris' right to maintain a website wherein she expresses her views, and violate Plaintiff Harris' right to speak with the press for publication. ¶¶ Id. at ¶¶ 79-83.

Count VI - That the same unlawful actions unduly burden the Homeowners' right to privacy within their home. Id. at ¶¶ 85-87.

Count VII - That the Defendants' enforcement of zoning regulations effected a substantive due process violation against the Homeowners and was "arbitrary and conscience-shocking in the constitutional sense." Id. at ¶¶ 89-91.[14]

_____

13. Although "the Defendants' unlawful actions" is also an undefined term, the remainder of the Amended Complaint suggests that it is intended to encompass Defendants' actions/writings as interpreted/asserted by the Zoning Officer in 2006. See, e.g., Amended Complaint at ¶ 74 (asserting that said actions "impose an undue burden on Plaintiffs' right to association by specifically prohibiting Plaintiffs from associating with their guests in their home for cultural evenings called house concerts").

14. This count will be dismissed for statute of limitations and ripeness reasons discussed infra.

The Court notes, however, that the count would also fail on the merits. As Plaintiffs are aware, in United Artists Theatre Circuit, Inc. v. Township of Warrnington, 316 F.3d 392 (3d Cir. 2003), the Third Circuit, in light of the Supreme Court's decision in County of Sacramento v. Lewis, 523 U.S. 833 (1988) held that a "shocks the conscience" standard applies to substantive due process claims arising out of land use decisions. United Artists, 316 F.3d at 402 (noting that its decision brought the Circuit "into line with several other Courts of Appeals that have ruled on substantive due process claims in land-use disputes") (citations omitted). See also id. (holding
(continued...)

10

Count VIII - That Defendants have intentionally treated Plaintiff Homeowners and

Performers differently from others similarly situated without rational basis, effecting a violation

of their equal protection rights.  Id. at ¶¶ 93-95.[15]

---

14.  (...continued)
that only "the most egregious official conduct" will rise to the level of a constitutional violation)
(citing Lewis, 523 U.S. at 846).  More recently, the Circuit has held that "unless defendants'
actions were 'completely unrelated in any way to a rational land use goal' there is no violation."
Corneal v. Jackson Township, 2004 WL 790315 (3d Cir. April 13, 2004) (citing Lewis, 523 U.S.
at 846); see also Lewis, 523 U.S. at 849 (identifying standard as "conduct intended to injure in
some way unjustifiable by any government interest").  Compare, e.g., Collier v. Town of
Harvard, 1997 U.S. Dist. LEXIS 23582 (D. Mass. Mar. 28, 1997) (conscience-shocking standard
met where Harvard Planning Board recommended denial of plaintiff's request for zoning variance
unless plaintiff granted easement to individual Board member whose private property adjoined
plaintiff's; motives were thus purely personal and totally devoid of any rational land use planning
concerns).

     In discussing its rationale, the Third Circuit has made clear that it deemed this heightened
standard appropriate in the land-use context in part because it "prevents [the Court] from being
cast in the role of a 'zoning board of appeals'", and because "[l]and-use decisions are matters of
local concern, and such disputes should not be transformed into substantive due process claims
based only on allegations that government officials acted with 'improper' motives."  Id. at 402
(citing Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982); Eichenlaub,
385 F.2d at 285 (noting that the United Artists test "is designed to avoid converting federal courts
into super zoning tribunals").

15.  This count will be dismissed for statute of limitations and ripeness reasons discussed infra.

     The Court notes, however, that this count would also fail on the merits.  Traditionally, equal
protection claims have been limited to plaintiffs who allege that they are members of a protected
class that has been denied equal protection of the law.  See, e.g., Lawrence v. Texas, 539 U.S.
558, 584 (2003).  Plaintiffs do not assert an equal protection claim based on differences in
treatment stemming from racial or other invidious forms of discrimination.  To the extent
Plaintiffs allege that Defendants discriminated solely against them by treating similarly situated
individuals more favorably, Plaintiff must allege facts demonstrating  that there was no rational
basis for the intentional difference in treatment.  See Village of Willowbrook v. Olech, 528 U.S.
562, 564 (2000) (holding that a "class of one" can attack intentionally different treatment if it is
"irrational and wholly arbitrary").  As noted above, the Board's Decision itself provides more
than one rational basis for such difference.  See The Development Group, LLC v. Franklin
Township Bd. of Supervisors, 2003 WL 22358440 at *7 (E.D. Pa. Sept. 24, 2003) (dismissing
                                                                              (continued...)

The relief sought by Plaintiffs includes a declaration of facial invalidity of the cited Zoning Ordinance provisions; a declaration that the 2003 Notice, the Board's Decision, and the 2006 Letter "are null and of no effect"; an injunction against Defendants as to any action to enforce a house concert prohibition against Plaintiffs; compensatory damages; punitive damages against the individual Defendants in their individual capacities; and fees and costs pursuant to 42 U.S.C. § 1988.[16]

On May 1, 2006, Defendants filed a Motion to Dismiss, to which Plaintiffs duly responded, and on which oral argument was heard by this Court, at Plaintiffs' request, on October 10, 2006.  Although the Motion to Dismiss devotes significant time to "waiver", Defendants largely conceded at oral argument that such portion of the Motion was misplaced/misnomered; Defendants corrected and clarified their present principal position as

_____

15. (...continued)

equal protection claim where plaintiffs failed to allege particular facts exhibiting the absence of a rational basis for such treatment); see also City of New Orleans v. Dukes, 427 U.S. 297, 305 (1976) (noting that issue is whether land use decisions "so lack rationality that they constitute a constitutionally impermissible denial of equal protection").  In addition, the Third Circuit has observed that "[t]he 'irrational and wholly arbitrary' standard is doubtless difficult for a plaintiff to meet in a zoning dispute and [the Court does] not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation." Eichenlaub, 385 F.3d at 287.  It therefore concluded that "[i]t may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach."  Id.

Finally, it may be observed that Plaintiffs have little need for protection under the equal protection clause, their equal protection theory being, at bottom, that in addition to violating their First Amendment rights Defendants' purport conduct violated their equal protection rights.  As the First Circuit has held in similar circumstances, "[g]iven the overlap of these claims . . . [there is] little basis or justification for applying equal protection analysis."  Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992).

16.  The Court observes that attorney's fees in a § 1983 action are apportioned based on hours reasonably expended on the successful claims, i.e., the relief obtained must justify that expenditure of attorney time.  See generally Hensley v. Eckerhart, 461 U.S. 424 (1983).

basing grounds for dismissal on (1) a statutory time bar to claims based zoning-related actions in 2003 and (2) the *unripeness* of claims based on the 2006 Letter.[17]

## IV. <u>MOTION TO DISMISS - STANDARD OF REVIEW</u>

_____In reviewing a motion to dismiss for failure to state a claim on which relief can be granted, the Court must consider the allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). The complaint must be sustained if relief can be granted under any set of facts that could be proven consistent with the allegations. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); <u>Ransom v. Marrazzo</u>, 848 F.2d 398, 401 (3d Cir. 1988). However, "legal conclusions made in the guise of factual allegations are not given the presumption of truthfulness" afforded to factual allegations. <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 809 F. Supp. 1172, 1175 (D.N.J. 1992). In deciding a Rule 12(b)(6) motion, the Court may refer to documents on which the complaint is based, those attached to the complaint, and those referred to in the complaint, without triggering conversion to a motion under Rule 56. The Court may also consider public records. <u>See Oshiver v. Levin</u>,

---

17. As the Court has concluded it appropriate to dismiss the Complaint on other grounds, it need not reach Defendants' assertions that the individual Defendants are entitled to qualified immunity and that, moreover, Plaintiffs have failed to state a claim against Defendant Arndt. The Court notes, however, that each of these arguments carries significant merit. <u>See Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) (directing that a government official is entitled to qualified immunity in a civil rights action unless "in light of the specific context of the case" the reasonable official would understand that what s/he was doing violated a clearly established right); <u>see</u> <u>also</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999) (requiring that "in the light of pre-existing law, the unlawfulness [of the conduct] must be apparent"). There is similar merit to Defendants' assertion that the Performers lack standing. <u>See</u> Defendants' BSMD at 19-21.

Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994); 12 Moore's Federal Practice § 12.34[2] (3d ed. 1998).  See also Plaintiff's BSRM at 7.

Finally, where it appears from the Complaint itself that a plaintiff will be unable to plead facts sufficient to state a claim under a cause of action alleged, and it is the Court's assessment, therefore, that any amendment would be futile, the Court is within its sound discretion to dismiss such cause of action.  See Foman v. Davis, 371 U.S. 178, 182 (1962).  This is particularly so where a plaintiff has already filed an amended complaint and has, therefore, had ample opportunity to plead his/her claims fully.[18]

## V.  ANALYSIS

1.  Claims Alleged to Arise from Particular Conduct of the Defendants in 2003

The Plaintiffs allege that the 2003 Notice and the Board's Decision effected violations of their constitutional rights, and bring claims under 42 U.S.C. § 1983.  See Amended Complaint's prayers for relief, discussed supra.  As Defendants duly note, § 1983 claims are subject to a two-year statue of limitations.  See, e.g., Garvin v. City of Philadelphia, 354 F.3d 215, 220 (3d Cir. 2003).

---

18.    See, e.g., Livingston v. Shore Slurry Seal, 98 F.Supp.2d 594, 600 (D.N.J. 2000) (citations omitted).

As Defendants also duly note, the continuing violations doctrine does not operate to extend the statutory period in this case.  In determining the doctrine's applicability, the Court considers the following three factors: (1) "subject matter", *i.e.*, whether the violations constitute the same type of discrimination; (2) "frequency", *i.e.*, whether the acts are recurring or isolated; and (3) "degree of permanence", *i.e.*, whether the act should have triggered the plaintiff's awareness of the alleged wrong and duty to assert his/her rights and whether the consequences of the act would continue absent a continuing intent to discriminate.  See id.  Moreover, the Third Circuit has emphasized that the third factor is the most important.  See id.

In the case at hand, Plaintiff Homeowners clearly understood at the time of the April 2003 hearing that the underlying ordinance, the 2003 Notice and the Board's potential affirmance of zoning-related restrictions on the concerts held at her residence could implicate constitutional concerns.  See Defendants' BSMD at 11-12 (citing to transcript of hearing); Plaintiffs' BSRM at 13, n. 2 (noting that "the constitutionality of the ordinance was raised" by Defendant Harris "in the original Township [Zoning Hearing Board] hearing"); id. at 15 (citing to Transcript of Hearing at 30, 64-65).[19]  The Homeowners nonetheless knowingly elected to modify the manner in which they conducted subsequent concerts - as indeed, Plaintiff Harris had suggested she would be willing to do - rather than to bring constitutional claims before the State or Federal Court.  See Cowell, 263 F.3d at 295 (noting that "the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in

---

19.  Plaintiff Harris expressed her concern that the Board's decision could affect "Constitutional issues" such as her right to privacy, freedom to assemble and freedom of speech.  See Transcript of Hearing at 30.  She also indicated her belief that if the Board determined that the zoning code "prohibit[ed]" the concerts, such a decision would violate her Federal and State constitutional rights.  See id. at 64-65.

pursuing their claims"); Cowell v. Palmer Township, 1999 U.S. Dist. LEXIS 19290, *9 (E.D. Pa.

1999) (denying application of continuing violation doctrine where plaintiff regarded acts as

"improper from the outset"); King v. Township of East Lampeter, 17 F.Supp.2d 394, 416 (E.D.

Pa. 1998) ("[I]f the prior events should have alerted a reasonable person to act at that time, the

continuing violation theory will not overcome the relevant statute of limitations.").[20]

Plaintiffs respond, however, that they need not rely upon a continuing violations theory to

maintain their claims with respect to the 2003 Notice and Decision; rather, Plaintiffs now assert

this entitlement under a theory of (a) no knowledge of injury, and so no accrual until 2006; or,

similarly, (b) equitable estoppel based on fraudulent concealment.  The Court notes that *no* such

allegations are raised in the Plaintiffs' Complaint or Amended Complaint.  In their Response to

the Motion to Dismiss, however, Plaintiffs suggest that the Township *intended, in 2003, a total*

*ban on house parties*, which it concealed from Plaintiffs by non-enforcement  until the 2006

Letter.  See Plaintiffs' Motion for Oral Argument at ¶ 7 ("Plaintiff's position is that Defendants

concealed the true intent of the April, 2003 decision, *i.e.*, to totally ban all house concert parties.

That statute was thus tolled until January, 2006 . . . ."); Plaintiffs' BSRM at 20 (asserting that "no

person using reasonable diligence could have known or could have had reason to know that there

---

20.  Tensions between our interests and conduct as individual citizens, and the interests and
conduct of the authorities governing our social and political communities, necessarily arise.
That is why our jurisprudence includes numerous complex and nuanced civil rights doctrines.
And it is why we are each called upon from time to time to assess perceived infringements on our
constitutional rights and liberties, and to weigh those infringements against the costs (both
personal and financial) of the various available forms of protest and/or challenge.  Should we
make an informed decision that a particular government action reflects a just balance of
competing interest, or that the degree of perceived injustice does not warrant the costs of an "as
applied" challenge, we remain free to challenge a subsequent infringement; we are, however,
bound to the consequences - including the running of a statutorily-prescribed period for challenge
- of our choice as to that particular action.

was a blanket prohibition on Plaintiff-homeowners' house parties" in 2003); id. at 22-23 (going

on to assert that "for almost three years, after the Plaintiffs had made changes to the character and

frequency of the gatherings . . ., the Township failed to inform the Plaintiffs that they were still in

violation of the zoning ordinance"); id. at 23 ("Had the Township informed Plaintiffs earlier, as

they ultimately did in January 2006, that no matter what changes she [sic] made all house concert

parties were banned, then Plaintiffs would have been put on notice that the statute had started to

run . . . ."); id. (asserting that "the total ban on house concert parties was concealed by the

inaction of the Township for almost three (3) years").

   These assertions that the Zoning Board meant something quite other than what it said -

that it intended a blanket prohibition when the majority of the Hearing was spent in identifying

neighbors' specific complaints and circumscribing the Board's narrow grounds for affirmance -

that it intended a blanket prohibition but issued a Decision reiterating those narrow grounds - that

it intended a blanket prohibition but took no enforcement action as to any of the Homeowners'

2004 and 2005 concerts - and that it must have so intended because a Zoning Officer said so in

2006 - are unsupported by the factual allegations of Plaintiffs' own Amended Complaint and the

record before the Court on this Motion to Dismiss.[21]  Moreover, the Court notes that Plaintiffs'

---

21.  Compare, e.g., Amended Complaint at ¶ 21 ("At the hearing on April 14, 2003, it was
evident that the Board believed that the alleged presence of all [the identified] factors added up to
an impermissible use of the residence by Plaintiff-Homeowners."); Plaintiffs' BSRM at 20 ("A
fair reading of the [Board]'s decision and a fair understanding of the hearing shows [sic] that the
[Board] did not ban the hosting of all house concert parties."); id. at 25 (discussing hearing
testimony and concluding that "[t]he [Board] obviously did not intend to prohibit Plaintiffs from
hosting all manner of house concert parties; in fact the solicitor makes reference to future house
concert parties [during the hearing]"); id. at 26 (noting that if the Board intended a blanket
prohibition, it "could have avoided a discussion of how to change the house concert parties to
allow Plaintiffs to conform to the Ordinance, but it did not do so").

counsel advanced these assertions further at oral argument, speculating that conspiracy and/or even financial corruption may have been involved.[22]  Again, no such allegations have been pled; nor does it appear that, within the confines of Rule 11, they could be.  Finally, the Court observes that such spurious conjecture reflects an unfortunate departure from the tenor and spirit of the discussions between the Homeowners and the Board at the 2003 Hearing.

For these reasons, Plaintiffs' constitutional claims alleged to arise from particular acts of the Defendants in 2003 are dismissed as time barred.


      2.  <u>Claims Alleged to Arise from the Zoning Officer's 2006 Letter</u>

As Plaintiffs correctly observe, an "*exhaustion* of state administrative remedies [is] not required as a prerequisite to bringing an action pursuant to Section 1983".  Plaintiffs' BSRM at 11 (quoting <u>Patsy v. Florida Board of Regents</u>, 457 U.S. 516 (1982)) (emphasis added).  But as Plaintiffs also correctly observe, "there is a conceptual difference between whether administrative remedies must be exhausted" and whether an action must be *ripe*.  And although the concepts overlap, the latter requires inquiry "into whether [a p]laintiff has given local land-planning authorities the opportunity to render a *final decision* on the nature and extent of the impact of the zoning ordinance on [the p]laintiff's property."  <u>Id.</u> (emphasis added) (citing <u>Taylor</u>

---

22.  <u>See</u> <u>also</u> Plaintiffs' BSRM at 28 (noting that if, after discovery, corruption or collusion could be shown, a substantive due process violation would have taken place); <u>id.</u> (asserting it "conceivable" there could be such a set of facts).  <u>Cf.</u> <u>United States v. Students Challenging Regulatory Agency Procedures</u>, 412 U.S. 669 (1973) ("Of course, pleadings must be something more than an ingenious academic exercise in the conceivable."); <u>Young v. Kann</u>, 926 F.2d 1396 (3d Cir. 1991) (noting that claims based not on fact but on suspicion and speculation are appropriately dismissed as frivolous); <u>id.</u> (concluding that no amendment would cure the plaintiff's clearly baseless allegations).

Investment Ltd. v. Upper Darby Township, 983 F.2d 1285 (3d Cir. 1993) and Williamson Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985)).[23]  See also County Concrete Corp. v. Township of Roxbury, 442 F.3d 159, 164 (3d Cir. 2006) (explaining that the ripeness doctrine counsels abstention until such time as a dispute is sufficiently concrete to satisfy the doctrine's constitutional and prudential requirements) (citing Kodara Envtl., Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir. 2004)).

As Plaintiffs themselves further observe, the Third Circuit has expressly held that a decision was not final and a case not ripe for review where the plaintiff "did not appeal the decision of the zoning officer to the Township Zoning Board".  Id. at 13 (citing Taylor, 983 F.2d at 1292-93).  See also County Concrete, 442 F.3d at 164 (noting that ripeness doctrine looks to whether the "decision maker has arrived at a definitive position on the issue").[24]

---

23.  In Williamson, the Supreme Court held that an as-applied constitutional claim against enforcement of a zoning ordinance is not ripe until "the government agency charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue").  473 U.S. at 186; see also County Concrete, 442 F.3d at 164 (so characterizing and quoting Williamson); Palazzolo v. Rhode Island, 533 U.S. 606, 620 (2001) (noting that "a landowner must give a land-use authority an opportunity to exercise its discretion").

More generally, the Supreme Court has identified the considerations underlying a ripeness determination as (1) "the fitness of the issues for a judicial decision" and (2) "the hardship to the parties of withholding court consideration."  Abbott Labs. V. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).

24.  Cf.  Williamson, 473 U.S. at 193-94 (holding federal suit unripe where local planning commission rejected development plat but plaintiff neither sought variance nor requested just compensation from appropriate authorities); MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 351-52 (1986) (holding constitutional claims unripe where plaintiff appealed rejection of subdivision plan, but failed to submit less intensive development plans to the planning commission, leaving "open the possibility that some development [would] be permitted").

(continued...)

19

Plaintiffs are entirely correct in their assertion that they have no obligation to appeal a decision of the highest local land-planning authority, such as the Board's 2003 Decision, to the Court of Common Pleas "for finality or ripeness purposes." Id. at 12 (citing R.J. Holding Co. v. Redevelopment Authority of County of Montgomery, 165 Fed. Appx. 175, 180 (3d Cir. 2006)). They do, however, as their own case discussion suggests, have an obligation to afford the Board an opportunity to reweigh in the balance (a) the Homeowners' interests in continuing to host voluntarily-modified house concerts, and (b) the neighbors' renewed complaints and corresponding government interests in protecting and preserving the character of the R-2 residential neighborhood.  See Plaintiffs' BSRM at 12-13 (citing County Concrete, 442 F.3d at 164, as holding that Williamson bars "claims which are not final in . . . 'as applied due process, substantive due process, and equal protection claims by property owners . . . who have challenged . . . *an initial decision maker but failed to take advantage of available subsequent procedures*'") (emphasis in Brief) (additional citations omitted); see also Lauderbaugh v. Hopewell Twp., 319 F.3d 568, 574 (3d Cir. 2003);[25] Peachlum, 333 F.3d at 434 (explaining that

---

24.  (...continued)
   Cf. also Hoehne v. County of San Benito, 870 F.2d 529, 532 (9th Cir. 1989) (stating that with Williamson and MacDonald, the Supreme Court "erected imposing barriers . . . . to guard against the federal courts becoming the Grand Mufti of local zoning boards") (cited with approval in Taylor, 983 F.2d at 1291).

25.  The Lauderbaugh Court found the plaintiff's claims ripe where the zoning board indefinitely continued plaintiff's appeals while proceeding with enforcement; the Court distinguished cases in which a plaintiff's failure to take advantage of available subsequent procedures left open a prospect that the controversy could be resolved and the need to address constitutional issues obviated.  319 F.3d at 575.  Cf. Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 138 (1974) (directing that "to the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues, the Court must determine whether to exercise that restraint").

"[w]here a dispute arises under circumstances that permit administrative review . . . final

administrative determination is favored under the ripeness doctrine"); id. (further explaining that

purpose is to prevent courts "through avoidance of premature adjudication, from entangling

themselves in abstract disagreements" and to "enable the agency to proceed wtihout judicial

interruption until an administrative determination has been formalized") (quoting Abbott Labs.,

387 U.S. at 148); Acierno v. Mitchell, 6 F.3d 970, (3d Cir. 1993) (noting, in holding

constitutional challenges unripe for failure to obtain final adjudication, that zoning regulation

"'generally affects a broad spectrum of persons and social interests, and . . . local political bodies

are better able than federal courts to assess the benefits and burdens of such legislation'")

(quoting Rogin v. Bensalem Township, 616 F.2d 680, 698 (3d Cir. 1980)).

Here, then, as in Taylor, Plaintiffs claims are not ripe because they failed to appeal the

Zoning Officer's decision to the Board.  See Taylor, 983 F.2d at 1290-92 (noting that Board had

exclusive authority to render a final adjudication under the terms of the Pennsylvania Municipal

Planning Code); id. (concluding that only a decision by the Board could therefore represent

clearly the impact of the ordinance(s) on the plaintiffs); 53 Pa. Stat. Ann. § 190909.1(a)

(providing that the zoning hearing board has exclusive jurisdiction to hear and render final

adjuciations regarding any decision of a zoning officer).  Cf. Plaintiffs' BSRM at 16 (asserting

that "[b]ecause Plaintiffs appealed the decision of the Zoning Officer . . . to the [Zoning Hearing

Board], no waiver on the basis of administrative finality or ripeness occurred . . . .").  [26]

---

26.  There is some suggestion in applicable precedent that Plaintiffs *may* also have had an
obligation to bring directly to the Board for a decision in the first instance their challenges to the
facial validity of the zoning ordinance, although the Court bases no holding on this grounds.  See
discussion, *infra*.

(continued...)

Rather than seek a Board determination on the validity/correctness of the Zoning Officer's 2006 Letter - a letter that in its sweeping prohibition clearly did not comport with the interpretation of the ordinance narrowly articulated by the Board in its 2003 Decision - Plaintiffs elected to bring this federal civil rights action.  This they cannot do.  Correspondence from a zoning officer cannot, and should not, without more, suffice to remove a zoning determination from the local planning authority to the Federal Court.  See Taylor, 983 F.2d at 1292 (concluding that, under Pennsylvania Municipal Planning Code, action by zoning officer does not represent township's final interpretation or application of a zoning ordinance) (citing Rogin, 616 F.2d at 694-95); id. at 1294 (discussing importance of allowing zoning board to consider zoning officer's action - alleged to stray from established procedure - "in the face of potential constitutional injuries"); id. (noting Supreme Court's observation that "[l]ocal zoning authorities are flexible institutions . . . that may 'give back with one hand what they have taken with the other'") (quoting MacDonald, 477 U.S. at 350).  Cf. id. at 1294, n. 16 (expressly agreeing with the Ninth Circuit that "the flexibility inherent in local zoning systems 'is obviously useless if the property

_____

26.  (...continued)
     Plaintiffs' BSRM acknowledges that the 2003 Hearing encompassed "no adjudication or decision" on constitutional concerns, but suggests that the Board was remiss because such issues were raised but not decided.  See Plaintiffs' BSRM at 15.  The Court notes that, as Plaintiff's own pleading later recounts, Defendant Harris expressed at the Hearing a belief that her constitutional rights would be violated *if* the Board were to interpret the Zoning Code as a blanket prohibition.  The Board reached no such conclusion and Defendant Harris raised no contemporaneous constitutional challenge to either the underlying ordinance or the Board's narrowly-circumscribed Decision.  To the contrary, her responses at that time bespoke willingness to comprise and reach a balanced accord.  See Plaintiffs' BSRM at 19 ("Plaintiff Harris was aware that injury to her Constitutional rights would occur only if the [sic] she could not [sic] longer hold these house concert parties."); id. at 19-20 (quoting Ms. Harris' statements to the Board) (citing Transcript at 30, 64-65); cf. id. at 20 (concluding that "since the [Board] did not 'prohibit [the concerts]' . . . there was no violation of Plaintiffs' rights at that time").

owners abandon their applications after rejection by civil servants with narrow authority and before seeking relief from a body with broader powers'") (quoting Southern Pacific v. City of Los Angeles, 922 F.2d 498, 503 n. 5 (9th Cir. 1990)).[27]

Accordingly, because Plaintiffs failed to bring their constitutional objections to the 2006 Letter to the Township's Zoning Board  for a final determination, and because the facts alleged lead this Court to conclude that the parties are not in a sufficiently final or adversarial posture, such claims are not yet ripe.  See Peachlum, 33 F.3d 433 (discussing ripeness test as concentrating on whether parties are in sufficiently adversarial posture and whether dispute has undergone sufficient factual development); id. (defining ripeness test in "post-enforcement" context as including prudential considerations such as whether agency action is final and whether further administrative action is needed to clarify agency's position, as when challenged prescription is discretionary); id. (looking, also, to whether party had suffered concrete injury, such as the entry of civil judgments and imposition of fines, prior to final administrative disposition).  Cf. Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004) (discussing prudential component of ripeness and considering "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration") (citing Abbot Labs. v. Gardner, 387 U.S. 136, 149 (1967)); Armstrong World Industries, Inc. by Wolfson v. Adams, 961 F.2d 405,

_____

27.  For the reasons aforesaid, neither (a) counsel's meeting with the Zoning Officer and Township Solicitor; nor (b) Plaintiffs' speculations of conspiracy, fraud, or corruption; nor (c) Plaintiff's post-oral argument Affidavit assertion that the Board Chairman told them to go to court rather than return to the Board in future, is a sufficient substitute for an official, fact-specific determination by the designated authority.  And, as to the last, the informal advice of the Board Chairman is, for purposes of the Court's determination of the ripeness of a constitutional challenge to municipal zoning, no more determinative of Plaintiff's rights under an ordinance or of the Board's position than an act of the Zoning Officer.

412 (3d Cir. 1992) (taking into account prudential consideration of degree to which postponing federal judicial review could "'materially alter the question to be decided'") (quoting <u>Renne v. Geary</u>, 501 U.S. 312, 323 (1991)).[28]

3.  <u>Facial Challenges to the Constitutionality of the Zoning Ordinance</u>

Plaintiffs correctly cite the Third Circuit's holding that First Amendment claims, including facial challenges to zoning ordinances, are "'subject to a relaxed ripeness standard because of a concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression.'" Plaintiffs' BSRM at 13-14;  <u>Peachlum v. City of York</u>, 333 F.3d 429, 434 (3d Cir. 2003) (deciding, as a matter of first impression, "whether the absence of adjudication by a municipal agency of the validity of a city ordinance precludes judicial consideration of First Amendment challenges").  <u>See</u> <u>also</u> <u>id.</u> at 438 (holding that "[r]ipeness standards are most relaxed when the First Amendment claim is a facial overbreadth challenge").[29]   Within the same paragraph, they also, however, correctly cite to the Circuit Court's subsequent holding that the ripeness rule "does not apply to facial attacks on a

---

28.  The Court observes that the parties' prior conduct, in the context of a Board hearing and decision-making process, suggests that reasonable and mutually-acceptable compromise may be obtained by renewed efforts on both sides.

29.  To the extent that subsequent portions of Plaintiffs' Brief may be read to assert that neither Plaintiffs' "'as applied' free speech claim" nor their "facial attack[] on [the] zoning ordinance" is subject to any ripeness requirement, the Court disagrees.  <u>See</u> Plaintiffs' BSRM at 15-16 (asserting that no "'administrative finality' <i>or</i> 'ripeness' rule" applies in <i>either</i> instance).  <u>Compare</u> <u>Peachlum</u>, 333 F.3d at 437 (explaining that administrative finality and ripeness doctrines are distinct and that "the finality rule is designed to enforce [a requirement that an administrative decision be formalized and its effects felt in a concrete way by the challenging parties], not to require the exhaustion of administrative remedies").

zoning ordinance." Id. at 13; County Concrete, 442 F.3d at 164.  Indeed, the precise application

of precedent, in this regard, suggests some not-unambiguous distinctions.[30]

Because the Third Circuit's subsequent decision, in County Concrete, more expressly

states the general inapplicability of the ripeness rule to a facial challenge,[31] and because

Plaintiffs' facial claims may be readily dismissed on the merits, the Court  bases dismissal on that

grounds.[32]

The Township's Zoning Ordinance identifies such general purposes as to "promote and

protect the health, safety, morals and general welfare of the residents . . . and of the public

generally" and to "protect the character and maintain the stability of residential, commercial and

manufacturing areas within the Township."  See Zoning Ordinance, Ch. 72.  The Court observes

that the Ordinance primarily concerns itself, as do zoning ordinances generally, with physical

building and lot/landscaping requirements (devoting, e.g., significant time to criteria for planned

residential developments), as opposed to personal conduct/activities.  The section of the

Ordinance relevant to the Homeowners' residence, and to which they object, is § 72.5, which

defines property uses in the Homeowners' R-2  "suburban residential district".  The list of

---

30.  See also Peachlum, 333 F.3d at 432, n.5 (noting, in dicta, that "commercial speech may be subject to a stricter ripeness test than non-commercial speech").

31.  See supra; County Concrete, 442 F.3d at 164 (explaining that in a facial claim  the plaintiff is arguing that any application of the challenged law is unconstitutional).  See also Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736 & n. 10 (1997) (explaining that a facial challenge to a zoning ordinance is generally ripe once the ordinance is passed, but that such challenges face an uphill battle since they are difficult to demonstrate).

32.  For an informative discussion of some of the jurisprudential difficulties in these areas, including some categorical indistinctness between "as applied" and "facial" challenges, see Richard H. Fallon, Jr., As Applied and Facial Challenges and Third Party Standing, 113 Harv. L. Rev. 1321 (April, 2000).

principal uses begins with "single family dwellings."[33]  The Ordinance also contains separate zoning criteria for commercial uses and identifies numerous of these uses, including "clubs".  See § 72.8.  It also suggests the considerations looked to in decisions impacting its goals of protecting and preserving residential neighborhoods.  See, e.g., § 72-13 (discussing temporary use permits, home-based businesses, and requirements for conditional uses and considerations of, e.g., traffic, parking, noise, odor, visual/asthetic impact, nuisance).

Plaintiffs' assertion that because "musical gatherings, parties and gatherings of friends are not explicitly permitted" in the R-2 district the Ordinance "purports to prohibit such residential uses"[34] is patently facetious.  Moreover, Plaintiffs' assertions that the Ordinance provisions are overly broad, unduly vague and/or effect a prior restraint on First Amendment rights because they (a) "infringe upon a substantial amount of constitutionally protected activity and uses of the property"; (b) place "unbridled discretion in the hands of Defendants to determine if a residential use is lawful" and "prohibit [First Amendment rights]"; (c) fail to define "commercial activity", thus prohibiting "potentially thousands of [constitutionally protected] uses . . ."; and (d) "provide[] no criteria by which the courts could review a finding that a resident's use . . . in an R-2 zone was prohibited", are similarly without merit.  See Amended Complaint ¶¶ 54-67.

As Defendants observe, zoning ordinance restrictions on the commercial use of property in residential areas are "commonplace" and generally constitutional, as reasonable time, place

---

33.  The other identified "Permitted Uses" in the R-2 district are parks, agriculture, planned residential developments, group homes, and forestry.  The lists of "Accessory Uses" and "Conditional Uses" referred to in Plaintiffs' Amended Complaint identify such further structures/uses as (a) garages, shed, pools, fences, public utility services, and home-based businesses; and (b) churches, schools and hospitals, respectively.

34.  Amended Complaint at ¶ 63.

and manner restrictions on commercial speech.  See, e.g., American Future Sys., Inc. v.

Pennsylvania State Univ., 752 F.2d 854, 869 n. 3 (3d Cir. 1984)(Adams, concurring); Village of

Euclid v. Ambler Realty Co., 272 U.S. 365, 391 (1926).  See also Ward v. Rock Against Racism,

491 U.S. 781, 791 (1989) (noting that it is "well settled" that a government agency may impose

reasonable - i.e., adequately justified without reference to content - time, place and manner

restrictions on speech); Village of Belle Terre v. Boraas, 416 U.S. 1 (1974) (Marshall, J.,

dissenting) (observing that a township is "unquestionably" free to maintain residential character

by restricting commercial use); id. (noting that zoning "may indeed be the most essential function

performed by local government"); Gascoe Ltd. v. Newton Township, Bucks County, 699 F.Supp.

1092, 1095 (E.D. Pa. 1988) ("A municipality's right to use its zoning power in the public interest

is perhaps the paradigm [of the validity of content-neutral time, place and manner restrictions on

speech].").

   The Court further notes, in response to Plaintiffs' conclusory overbreadth claim, that no

zoning ordinance could possibly identify with individual specificity every possible "single family

dwelling" activity; for this reason, zoning ordinances routinely employ categories with

discretion.[35]

---

35.  See generally Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc., 482
U.S. 567 (1987) (explaining that, before a statute may be held invalid on its face, its overbreadth
must be substantial, i.e., "there must be a realistic danger that the statute itself will significantly
compromise the First Amendment protections of parties not before the Court"); Broaderick v.
Oklahoma, 413 U.S. 601, 613 (1973) (directing that striking a statute down as overly broad is
"strong medicine" to be invoked only "as a last resort").

   Cf. Waters v. McGurim, 656 F.Supp. 923, 926 (E.D. Pa. 1987) (holding that federal court
must consider any limiting construction that enforcement agency has offered in connection with
facial challenge to state statute or ordinance) (citing Village of Hoffman Estates v. Flipside, 455

(continued...)

As to a claim of impermissible discretion, again, it is inherently impossible for zoning ordinances to expressly identify each permitted use, and it is for that reason that a degree of discretion similar to that reflected in the ordinance at issue is routine.  Such discretion does not render the zoning statute/ordinance unconstitutionally vague. The ordinance before the Court contains standards and permitted uses which are appropriately delineated in commonplace, familiar terms and categories.  See *supra*.  See generally County Concrete, 442 F.3d at 167 (citing the Supreme Court's rule in Williamson as "respond[ing] to the high degree of discretion characteristically possessed by land-use boards").[36]

# VI. __CONCLUSION__

_____For the reasons set forth above, Defendants' Motion to Dismiss will be granted.

The Court emphasizes in so holding that it is not unsympathetic to the constitutional concerns which would be raised if a Township's Zoning Board  were to decree, with appropriate

_____

35.  (...continued)
U.S. 489, 494 n. 5 (1982)).

36.  Cf. Grayned v. City of Rockford, 408 U.S. 104, 110 (1971) (holding that statute need only give fair warning of the types of conduct proscribed in light of common understanding and practices).  The case law is replete with discussions of the constitutionality of broad municipal distinctions between uses permitted in residential versus commercial zones, owing to the substantial public interests involved.  It also clearly reflects the sound jurisprudential principle that a zoning ordinance, to avoid a facial challenge, need not define terms - such as "commercial" - for which the courts have previously provided adequate definitions.  See, *e.g.*, Major Media of the Southeast, Inc. v. City of Raleigh, 621 F.Supp. 1446 (E.D.N.C. 1985).

finality, a blanket prohibition on house concerts in a residential neighborhood.[37]  Finally, the

Court recognizes the particular importance of intimate concerts as an available forum to the folk

music community, as that community is often defined not only by its tradition as the "people's

music" (*i.e.*, giving voice to everyman's life experiences), but also by its ideas about how and

where music should be made and performed (*i.e.*, in contrapose to "commercial" mass music-

making).  But, again, a blanket prohibition of house concerts is not before this Court as a final

decision of the Township's Zoning Board at present; and  the case *sub judice* cannot now be

maintained.

---

37.  No less a touchstone than Justice Marshall has deemed unconstitutionality a municipal authority's imposition, through zoning, of  "greater restrictions on those who deviate[d] from the community norm." Village of Belle Terre, 416 U.S. 1 (Marshall, J., dissenting) (disdaining an ordinance which acted, in effect, "to fence out [of a community] those individuals whose choice of lifestyle differ[ed] from that of its current residents").  The ordinance at issue in Belle Terre permitted any number of persons related by blood or marriage to reside in a single-family dwelling, but limited to two residents those "bound by profession, love, friendship, religious, political affiliation, or mere economics".  Id.

See also American Future Systems, 752 F.2d at 869, n. 3 (noting that Court would be faced with "quite a different question if there were a credible suggestion that the purpose of the restriction" was to inhibit a particular activity rather than preserve the residential character of a community/neighborhood).

_____An appropriate Order will follow.




                                               /s/Lisa Pupo Lenihan_____
                                              LISA PUPO LENIHAN
                                              United States Magistrate Judge


Dated: November 7th, 2006


cc:      All Counsel of Record